## Lacy *versus* Green *et al.*

1. Where the meaning of an agreement is doubtful, its terms are to be considered in the light thrown on them by proved or admitted illustrative facts. The situation in which the parties stand, the necessities for which they would naturally provide, the conveniences they would probably seek to secure and the circumstances and relations of the property in regard to which they have negotiated, are all elements in the interpretation of an ambiguous contract. The established usages of the trade or business to which the subject matter of the agreement belongs, and the general customs of the community in the conduct of that trade or business, are also to be kept in view.

2. A. owned a large tract of timber land on the head waters of Raccoon creek. The outlet for the lumber taken therefrom was either by hauling with teams or at times of high water by floating it down the channel of the creek, which flowed into the Tionesta, where the lumber was rafted and thence floated to market. A. also owned certain lands and mills at the mouth of Raccoon creek, which he sold to B., reserving in the deed " the right of occupying the pond and shore above the Hall & Lacy Mills and the mouth of Raccoon creek, for the purpose of securing and holding lumber and timber taken from the property of A." A. piled his lumber on the shore of the pond above the mouth of the creek preparatory to rafting, and B. brought an action for use and occupation, contending that the reservation in the deed only gave to A. the right to moor his lumber in the stream and fasten it to the shore. *Held*, reversing the court below, that A. had the right to pile his lumber on the bank of the Tionesta, and raft it in the ponds above the mills.

3. In the commonly accepted use of the word the " shore" of a river is the land adjacent to the water-line, and is applied in the same general sense in which the same term is popularly applied to the land adjacent to the water of an inland sea or to one of the great American lakes.

[Lacy v. Green.]

4. In its primary and most familiar sense the word " occupy" is the equivalent of the word "possess," and implies a permanent tenure for a period of greater or less duration, and from the provisions of the reservation and the situation of the parties in this case it was manifestly their intent that A. should take possession of the bank to pile his lumber on, and the pond in which to prepare his rafts.

June 8th 1877.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Common Pleas of *Warren county:* Of May Term 1877, No. 26.

Assumpsit by Luther Green *et al.*, administrators of Joseph Green, deceased, against George S. Lacy, for the use and occupation of a strip of land along the Tionesta creek.

On the 19th of August 1864, Lacy's wife and her sister, Miss Foord, sold certain lands in the locality of this strip in dispute, including the Hall & Lacy Mills, on the Tionesta creek, a short distance below the mouth of Raccoon creek, to the Tionesta Oil, Lumber and Mining Company, under whom the plaintiff's intestate claimed.

On the head waters of Raccoon creek, Lacy and those interested with him had a large tract of pine timber land whose only outlet was the valley of this creek, either by water or hauling. A road had been laid out and partially constructed up this creek, and it was contemplated to clear out its channel and make it navigable in high stages of water.

In the deed of the 19th of August 1864, was the following reservation :—

" Reserving to the party of the first part, his heirs and assigns, the use of the road and the right of repairing the same, leading down the valley of the Big Raccoon creek from near Hall & Lacy's Mills to the upper boundary of lot No. 5509 ; also the right of navigating and improving Big Raccoon creek, for the purpose of running lumber and timber from the Foord & Lacy lands, and of taking timber, excepting pine, along the valley of said run, for improving said stream ; also, the right of occupying the pond and shore above the Hall & Lacy Mills and the mouth of Big Raccoon creek, for the purpose of securing and holding lumber and timber taken from the said Foord & Lacy property."

In the winter of 1867 and 1868, T. B. Cobb, a jobber under the defendant below, drew boards from the Foord & Lacy Mills up the Raccoon creek and piled them on the shore of the pond just above the mouth of Raccoon creek and the Hall & Lacy Mills, preparatory to and convenient for rafting. For the use of the ground thus occupied the plaintiffs brought this suit.

The defendant claimed he had the right to the use and occupancy of the shore or bank of the stream for securing and holding his lumber until rafting time, under the reservation in the deed above recited.

[Lacy *v.* Green.]

The following points were submitted by plaintiffs:—

1. The rule that a deed shall be construed most strongly against the grantor, applies to the reservations in a deed made by the grantor in favor of the plaintiff.

2. There is no reservation in the deed from defendant and wife to the Tionesta Oil, Lumber and Mining Company, which confers the right upon the defendant to pile lumber and timber on the land described in the deed.

The court, Vincent, P. J., affirmed both of these points, and in the general charge said:—

"The defendant contends that this last clause means a right to haul lumber from the upper mills and pile it upon plaintiffs' land, and raft it therefrom. The only witnesses examined on the subject say, that they would understand that to give only the right to secure the lumber and timber to the shore by securing it to trees, stumps and other sufficient fixtures thereon, it remaining in the water. And when we consider that up to the time of sale in 1864, no such right had been exercised by the defendant, and that he reserved the right to improve the creek so that he could run lumber and timber out of it, and that if the right to pile and raft was intended, it would have been as easy to say that, as to say *secure and hold*, we have come to the conclusion that the reservation in the deed of 1864, does not confer on Lacy or his assigns any right to pile lumber on the ground of plaintiff without his consent, or without paying what it is reasonably worth if he does so occupy it."

The verdict was for the plaintiffs for $16.80, and defendant took this writ, assigning for error, the answers to the plaintiffs' points and the foregoing portion of the charge.

*Johnson & Lindsey*, for plaintiffs in error.—The plain, natural and obvious meaning of the reservation in view of the situation of the parties, the property and the uses to be made of it was, that Lacy should have a place to deposit his lumber, which would be hauled during the winter, until rafting time, on the bank of the Tionesta, above the mouth of Raccoon creek, and not simply to moor it in the stream and tie it to the bank, a right common to every one, and which it would have been unnecessary to reserve. Taking the most familiar definitions of the words used in the reservation it would read: "To take and keep possession of and use the land adjacent to or bordering upon the pond above the Hall & Lacy Mills and the mouth of Raccoon creek, for the purpose of guarding effectually from danger and making safe the lumber from the Foord & Lacy property."

Surely this could not mean the water-line or the space of land between high- and low-water mark, as contended for by the plaintiffs.

[Lacy v. Green.]

*R. Brown*, for defendant in error.—The true interpretation of the reservation, as lumbermen understand it, is that it only gives the right to secure the lumber to the shore by fastening it to trees, stumps and other fixtures thereon, while the lumber is in the water, and not to pile it on the bank.

"Shore," has not the signification given to it by plaintiffs in error. The bank of a stream is the continuous margin where navigation ceases; and the shore is the pebbly, sandy or rocky space between that and low-water mark; McCullough *v.* Wainright, 2 Harris 171; Bouvier's Law Dictionary: *Sea shore*—"that space of land between high- and low-water mark;" *Shore*—"strictly speaking, when the water does not ebb and flow in a river there is no shore." See also Worcester's Dictionary: *Shore*—"a river in which the tide does not ebb and flow has no *shores*, in the legal sense of the term."

In Howard *v.* Ingersoll, 13 How. 381, the bank of a navigable river is defined to be the first land which confines the water of the river in its channel or bed in its whole width, and the shore is that part which is left dry at times and occasionally covered with water up to the bank. *Beach* is synonymous with shore: Littlefield *v.* Littlefield, 28 Maine 180. "But the shore of navigable waters and the soil under them belong to the state in which they are situated as sovereign:" 3 Kent's Com. 327.

Although the common law as to ownership is not applicable in this state, the foregoing rule shows that *shore*, when used in legal proceedings, is not ground on and back of the bank on which lumber can be piled, but is a part of the *beach*, that part between high- and low-water mark over which the water ebbs and flows.

Mr. Justice WOODWARD delivered the opinion of the court, October 1st 1877.

This cause has been twice argued. While the amount in controversy in it is insignificant, the question it presents is important, for the right to the possession of the piece of land for the use and occupation of which the plaintiffs have sought to recover is dependent on its determination. It has been considered, therefore, with the care and deliberation demanded by the value of the ultimate interests involved.

Previously to the 19th of August 1864, the wife of the defendant below and her sister had been the owners of a tract of land on Tionesta creek, which they conveyed that day to the Tionesta Oil, Lumber and Mining Company. Included in the tract were the Hall & Lacy Mills on the Tionesta, a short distance below the mouth of Big Raccoon creek. The title of the Oil, Lumber and Mining Company subsequently became vested in Joseph Green, the intestate of the plaintiffs below. At the same time the defendant was a part owner of a body of timber lands along Big Raccoon

[Lacy *v.* Green.]

creek, some miles above its junction with the Tionesta. These lands have been designated throughout the record as the Foord & Lacy property. The deed of the 19th of August 1864, contained a stipulation in these words : " Reserving to the party of the first part, his heirs and assigns, the use of the road and the right of repairing the same, leading down the valley of the Big Raccoon creek, from near Hall & Lacy's Mills to the upper boundary of lot No. 5509 ; also, the right of navigating and improving Big Raccoon creek, for the purpose of running lumber and timber from the Foord & Lacy lands, and of taking timber, excepting pine, along the valley of said run for improving said stream ; also, the right of occupying the pond and shore above the Hall & Lacy Mills and the mouth of Big Raccoon creek, for the purpose of securing and holding lumber and timber taken from the said Foord & Lacy property."

In the winter of 1867 and 1868, a quantity of lumber belonging to the defendant was hauled from the Foord & Lacy Mills and piled on the bank of the Tionesta, and this suit was brought by the plaintiffs to recover the usual compensation for the use of their property for piling and rafting purposes. On the trial, while there was some evidence that the defendant had inquired of the agent of the plaintiffs if there would be a chance of piling lumber on the bank, the legal question presented to the court below involved a construction of the reservation in the deed to the Oil, Lumber and Mining Company, and the decision of that question is the only subject open for review. On the part of the plaintiffs it was insisted that the only rights reserved for the benefit of the owners of the Foord & Lacy property, were to use the pond for the temporary security of rafts to be run down Big Raccoon creek, and to tie those rafts to such trees, stumps or posts as might be found on the bank of the Tionesta. On the part of the defendant it was claimed that the right extended to the use of the land of the plaintiffs for piling the lumber hauled from the Raccoon creek mills and rafting it in the waters of the pond. The court adopted the view of the plaintiffs, and a verdict was rendered by the jury in their favor.

Where the meaning of an agreement is doubtful, its terms are to be considered in the light thrown on them by proved or admitted illustrative facts. The situation in which the parties stand, the necessities for which they would naturally provide, the conveniences they would probably seek to secure, and the circumstances and relations of the property in regard to which they have negotiated, are all elements in the interpretation of an ambiguous contract. The established usages of the trade or business to which the subject-matter of the agreement belongs, and the general customs of the community in the conduct of that trade or business, are also to be kept in view. By the terms of the stipulation in question here,

the right was reserved " of occupying the pond and shore above
the Hall & Lacy Mills and the mouth of Big Raccoon creek for
the purpose of securing and holding lumber and timber taken from
the Foord & Lacy property." It has been argued for the plaintiffs
that the word "shore" in this connection could mean nothing other
than the water-line of the Tionesta, or; at the utmost, nothing
beyond the pebbly beach extending from the high-water line to the
low-water line of the creek. It is possible that this conclusion
would be warranted by the application, in strict analogy, to the
waters of inland streams of the technical rules which, in various
forms and for various purposes connected with the protection of the
public revenue and·the maintenance of rights of sovereignty, have
defined the shores of the ocean. But no such technical rules have
ever been established in relation to rivers that have no tidal flow.
The influence and extent of the ocean tides are permanent and
uniform, and the space they cover is subject to natural laws of
unvarying application. So definite is the doctrine that uniformity
and universality must exist to warrant the unbending application of
the abstract rule relied on, that it has been settled by the custom
of Scotland that the sea-shore does not extend further than to that
point which the sea reaches in common tides, and therefore that
sea-greens, which are overflowed only in spring tides, are not *inter
Regalia*, but are private property : 3 Tom. Law Dict. 440. The
swelling of the volume of an inland stream is always casual, uncer-
tain in time, purely conjectural in extent, and always the result of
unforeseen and unanticipated climatic conditions. In the com-
monly accepted use of the word, the shore of a river is the land
adjacent to the water-line, and is applied in the same general sense
in which the same term is popularly applied to the land adjacent to
the water of an inland sea or to one of the great American lakes.
The principle laid down by Mr. Justice COULTER, in McCullough
*v.* Wainwright, 2 Harris 171, was a principle applicable to the facts
before him. There a privilege had been granted to erect mills in
the Allegheny river, between Wainwright's island and the east
shore, and to use the space between the water and the trees growing
along the shore. There was no room for the interjection into that
case of a rule of law that should be of pervading application. The
"shore" was defined by the contract. It embraced the land
bounded by the water-line on one side and the line of the trees on
the other. If the limit insisted on by the plaintiffs here were to be
rigidly established, the whole of the last clause of the reservation
would prove to have been absolutely abortive. Rafts could be run
down Raccoon creek only in periods of freshets, and the entire
space alleged to constitute the " shore" would be covered with water.
If the stipulation meant only that rafts should be fastened to some
tree or some structure within that space, and that they could not
be secured, when it should be submerged, against the bank of the

stream, the owners of the Foord & Lacy property would have found safer protection under the usages of the lumber trade than they derived from the provisions of their contract.

A fact disclosed on the face of the reservation would seem to be conclusive against the theory of the plaintiffs. The "right of occupying the pond and shore" was to be exercised along the Tionesta not only above Hall & Lacy's Mills, but above "the mouth of Big Raccoon creek." The northern bank of that creek at the junction of the two streams is opposite the southern bank of the headrace leading out of the Tionesta to Hall & Lacy's saw-mill. Above the line connecting these two points there must be some current in the Tionesta, the force of which would depend on the volume of water in the channel. A short distance north of the mouth of Raccoon creek is the southern termination of what the draft shows to be a narrow island, some thirty perches long, and distant from the eastern shore of the Tionesta about one-third of the width of the stream. It is barely conceivable that the owners of the Foord & Lacy property intended to secure to themselves a right so vain and valueless as that of forcing rafts that should be floated down the Raccoon up the current of the Tionesta in order to lodge them in the narrow channel between the island and the main land. It is among the possibilities of things that some rational object was attainable by a contract so extraordinary as this would be under the construction contended for, but express and unequivocal words would be required to justify such a construction and establish such a contract.

In the concluding clause of the reservation, the word "occupying" is believed to have expressed the governing idea in the minds of the parties, and to furnish the key by which their intention should be interpreted. The pond and shore were to be *occupied* "for the purpose of securing and holding lumber and timber taken from the Foord & Lacy property." In the primary and most familiar sense of the word "occupy," it is the equivalent of the word "possess." It implies the conception of permanent tenure for a period of greater or less duration. While the parties had stipulated for a possession of the pond and shore, the decision of the Common Pleas cut the stipulation down to a mere use of the most casual and transient possible kind. Against the theory on which that decision was based were arrayed all the surroundings of the parties, the nature and situation of the property of the grantors in the deed, and the intendment to be made from the general provisions of the reservation. At the time when the contract was made, the strip of land along the Tionesta which is now in dispute was uncleared and waste. Foord & Lacy were the owners of land along the Big Raccoon creek on which there was standing timber capable of producing from seventy-five to a hundred millions of feet of lumber. A road leading up the creek from its junction with the

[Lacy v. Green.]

Tionesta had been partially built, and the right of the grantors to complete it and keep it in repair was retained over the land conveyed. The right was also stipulated for to improve and navigate the creek. This was followed by a reservation of the occupancy of the pond and shore of the Tionesta in order to secure and hold, not the lumber and timber that should be rafted down Raccoon creek, but the lumber and timber that should be "*taken from* the Foord & Lacy property." A contract was not required to entitle the owners of the upper lands to couple together rafts that should be run down Raccoon creek in the pool formed by the Hall & Lacy dam. The privilege of using such a stream for such a purpose has always been exercised without stint or limit. And the privilege of securing rafts to the banks of navigable streams in ordinary exigencies and for reasonable periods has been usually conceded as a common right. Something more, then, was designed than to permit lumber to be run out of Raccoon creek on its way to market. There was but a single purpose to be gained by the agreement, and that, it seems manifest, was to authorize Foord & Lacy to pile their lumber on the bank of the Tionesta, and to raft it in the pond above the Hall & Lacy Mills.

Judgment reversed and *venire facias de novo* awarded.

MERCUR and GORDON, JJ., dissent.