# Keiser, Appellant, v. Reading Suburban Real Estate Company.

*Partition—Equity—Answer—Findings of fact—Evidence—Impracticability of partition.*

1. Where on a bill in equity for partition the defendant's answer avers that it was impracticable to make partition of one of the tracts consisting only of strips of land, and that it was valuable only as controlling future street lines and extensions, and plaintiff offers no evidence to contradict the answer, and the court finds that partition of the tract was impracticable, and that it would be inequitable to compel the defendants to pay the plaintiffs anything on account of the

tract, a decree refusing partition of the tract in question will be sustained.

*Contract—Construction—Particular words—General words—Construction by parties—Partition.*

2. However general may be the words of one clause of a contract if, from other clauses of the same instrument, it is plainly and irresistibly to be inferred that the words could not have been intended to control in the disposition of a particular subject of the contract, the operation of such general words will be restrained.

3. Wherever the terms of an agreement are equivocal or doubtful, or the language of the contract is ambiguous, the practical interpretation of it by the parties themselves in carrying it into effect is entitled to great, if not controlling, influence. This principle is applicable where parties agree to a partition of lands and the agreement is followed by an actual partition and an exchange of deeds followed by a period of four years without any controversy as to the construction of the agreement.

4. The rule which allows extrinsic evidence to explain the extent of the subject of an agreement has no application where a subject-matter exists which satisfies the terms of the instrument. This rule applies to the construction of an agreement for partition of land where certain of the land is excepted, and the boundaries of such land, as described in the agreement, actually exist on the ground.

*Contract—Offer—Revocation of offer—Partition.*

5. Where certain of the parties to an agreement for partition of land make an offer, in modification of the agreement, upon a misapprehension as to the quantity of the land, such parties may revoke the offer, upon discovery of their mistake, before the offer has been accepted.

*Contract—Co-owners of land—Expenses of sale.*

6. Where several co-owners of land agree that three of their number shall sell the land and after deducting the "costs of collection" divide the proceeds among the owners, the expenses of keeping up an office and the needful instrumentalities for attending to the business will be included in the "costs of collection;" but if it appears that the three owners used the office and the other instrumentalities partly in their own business, and there is evidence to show approximately that they ought to bear personally one-half of the expenses, the Superior Court will not review the action of the lower court in cutting down their claim for the whole expenses of the office and other instrumentalities, to one-half.

*Contract—Dissolution of corporation—State taxes.*

7. Where five persons owning all the stock of a corporation, and

also owning lands as tenants in common, enter into an agreement by which two of their number are to surrender their stock in the corporation and receive therefor two-fifths of the company's lands, and partition is to be made of the lands held in common, and it is agreed that the lands so held in common shall be sold by the owners of the three-fifths, and the proceeds divided equally among all the five owners, less the costs of collection, the owners of the two-fifths cannot be charged on final accounting with any portion of the state taxes on corporate stock which had accrued after the cancellation of their stock and the dissolution of the corporation; but they are chargeable with their proportion of attorneys' fees accruing after the cancellation of the stock, where it appears that such services were a benefit to all the parties in interest.

*Contract—Accounting—Depreciation of furniture.*

8. Where co-owners of land agree that three of their number shall sell the land and divide the proceeds, and further agree that other property, including certain office furniture and fixtures, shall be divided share and share alike, and the office furniture and fixtures are appraised at a certain sum at the time of the agreement, the persons selling the land should not be permitted in their final accounting to charge themselves with only one-third of the appraised value of the furniture and fixtures, without any proof of depreciation in value.

Argued Nov. 12, 1909. Appeal, No. 216, Oct. T., 1909, by plaintiff, from decree of C. P. Berks Co., Equity Docket, 1906, No. 906, on bill in equity in case of David H. Keiser v. The Reading Suburban Real Estate Company, Thomas P. Merritt, Albert Thalheimer, Levi W. Mengel and Hannah Keiser. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Decree modified.

Bill in equity for partition and an accounting. Before ENDLICH, P. J.

The bill alleged that the plaintiff and the four individual defendants had been substantially the only stockholders of the Reading Suburban Real Estate Company each owning about one-fifth of the stock; that the corporation was the owner of sundry tracts of land; that the plaintiff and the four individual defendants also jointly owned other tracts of land, each owning one-

fifth; that on May 31, 1901, the corporation and the five individuals entered into an agreement that all the lands owned by the corporation and by the individuals jointly should be parted (and the other small stockholders settled with at the joint expense) so that the plaintiff and Hannah Keiser should each own a divided fifth of the company's lots and lands on surrendering their stock for cancellation, leaving the corporation the owner of the other three-fifths and that the plaintiff and Hannah Keiser should have a two-fifth share of the lands held individually, and that the plaintiff and Hannah Keiser should each have also one-fifth of the moneys owing and other assets of the corporation on an accounting; that the agreement had been partially carried into effect by the plaintiff and Hannah Keiser surrendering their stock and receiving deeds for one-fifth each of part of the company's lands in pursuance of a partial partition, and for a two-fifth share of the lands held individually; but that other tracts remained to be parted and an accounting remained to be stated and prayed relief accordingly.

Hannah Keiser appeared but did not answer.

The answer of the corporation and the three other individual defendants admitted the main averments of the bill but alleged that some of the other tracts of which the plaintiff claimed partition were incapable of partition or were included in the description of the purparts already allotted to the three defendants. The answer admitted the right of the plaintiff to partition of other tracts and to the accounting.

The agreement on which the bill was based, is as follows:

"This agreement made the 31st day of May, A. D. 1901, by and between The Reading Suburban Real Estate Company, a corporation, and Thomas P. Merritt, Albert Thalheimer, Levi W. Mengel, Hannah Keiser and David H. Keiser, witnesseth:

"Whereas, the individuals above named own nearly all the stock of The Reading Suburban Real Estate

Company, which Company owns land situate in Spring Township, Berks County, and as individuals, own also a number of tracts of land, namely, the Yeager tract and the Yost tract, that is to say, the remainders of. the said tracts, part thereof having been sold, and

" Whereas, the said individuals own also a Water Plant located upon the property, aforesaid, and

"Whereas, the said parties have determined to divide the said properties among them as hereinafter fully set forth;

"Now therefore, it is agreed by and between the said parties as follows:

"First. All the lots and land owned by The Reading Suburban Real Estate Company shall be divided by David H. Keiser into five equal parts, the portion of the Yost Farm situate west of Evans Avenue, containing about sixty-two (62) acres, shall not be embraced in the said division, and the said Hannah Keiser and David H. Keiser shall each of them take such one of the said one-fifth parts as the said Thomas P. Merritt, Albert Thalheimer and Levi W. Mengel shall indicate; in default of the said last named three parties indicating, then the said Hannah Keiser and David H. Keiser may severally choose one of the said 5 purparts.

"The purparts so chosen shall be conveyed to the said Hannah Keiser and David H. Keiser, respectively, in fee simple, and moreover, the said Reading Suburban Real Estate Company shall assign, transfer and set over unto the said Hannah Keiser and David H. Keiser an undivided two-fifths of all moneys owing to the corporation for lots sold or otherwise and the undivided two-fifths of all other property or assets not otherwise hereinafter disposed of in this Agreement and the said corporation shall from time to time account for and pay to the said Hannah Keiser and David H. Keiser two-fifths of the net proceeds of moneys collected, as hereinafter more specifically set forth and upon said conveyance and assignment, the said Hannah Keiser and David H. Keiser shall sur-

render their holdings of stock in the said Reading Suburban Real Estate Company to the corporation for cancellation.

"Second. There shall be made two parcels or purparts of certain of the remaining property of the said parties as follows:

### Purpart No. 1.

| | | |
|---|---:|---:|
| Yost, 62 acres, $150, | $9,300 | |
| Mortgage $10,000, | 10,000 | |
| | ——— | $700 |
| Yeager, 33 acres, $300, | $9,900 | |
| Chestnut, 10 acres, $10, | 100 | |
| | ——— | $10,000 |
| | | $9,300 |

### Purpart No. 2.

| | | |
|---|---:|---:|
| Water Plant, | | $6,000 |
| Endy House, | | 2,000 |
| Springmont House, | $1,800 | |
| Mortgage, | 1,200 | |
| | ——— | $600 |
| Hartgen House, | $2,000 | |
| Mortgage, | 1,275 | |
| | ——— | $725 |
| | | $9,325 |

"The said Hannah Keiser and David H. Keiser may elect to take either one of the said purparts named, that is to say, purpart No. 1 for $9,300, subject to the mortgage of $10,000, or purpart No. 2 for the sum of $9,325, and as the said Hannah Keiser and David H. Keiser have but a two-fifths interest as against a three-fifths interest of the remaining three parties, the said Hannah Keiser and David H. Keiser shall be charged with such sum as shall equalize the said parties.

"Third. The said Hannah Keiser and David H. Keiser shall be entitled to receive each of them one-fifth of the

moneys in the treasury of The Reading Suburban Real Estate Company and any other money on hand in the said enterprises and shall also receive each of them one-fifth of all moneys collected on account of lots or land already sold, but from the said moneys there shall be deducted before a division of them, the cost of collection and expenses of keeping up the streets and walks through the property of the said corporation.

"Fourth. It is hereby covenanted and agreed that the present building restrictions shall be binding upon all of the said parties their heirs and assigns with reference to the property hereby disposed of and that all the parties to this Agreement, their heirs and assigns, shall be entitled to be served with water as to any and all of the property hereby disposed of through and by means of the said Water Plant upon equal terms, so that the parties, who under this Agreement, do not take the Water Plant, their heirs and assigns, shall have the same rights to be served with water, through and by means of the said plant as the parties taking the said Water Plant, their heirs and assigns.

"Fifth. The said five individual parties hereby covenant with each other that all expenses, costs and damages incurred by or accruing from any litigation concerning past matters, including the appropriation of streams or parts of streams of water for the Water Plant, shall be borne equally by the said five individual parties, their heirs, executors and administrators.

"Sixth. The shares of stock of The Reading Suburban Real Estate Company held by other than the individual parties to this Agreement, shall be purchased by, for and on account of the individual parties to this Agreement at such prices as shall be satisfactory to all of the said parties and the purchase money to be paid out of the funds of the Company and the interests of Hannah Keiser and David H. Keiser in the stock so acquired shall be surrendered with their other stock in accordance with the terms of Article First of this Agreement.

"The terms of this Agreement shall be fully carried out and executed within thirty days of the time of the division of the lots by David H. Keiser, as hereinbefore provided, and the Reading Suburban Real Estate Co. shall promptly furnish to the said David H. Keiser such data as he shall ask for and require to enable him to make the said division.

"Witness, the corporate seal of the said Reading Suburban Real Estate Company and the hands and seals of the parties hereto the day and year first above written.

"THE READING SUBURBAN REAL ESTATE CO.    [SEAL]

"THOS. P. MERRITT, Pres't.

"THOMAS P. MERRITT       [SEAL]

"ALBERT THALHEIMER       [SEAL]

"LEVI W. MENGEL          [SEAL]

"HANNAH KEISER           [SEAL]

"DAVID H. KEISER         [SEAL]"

Other facts appear by the opinion of the Superior Court.

*Error assigned* was the decree of the court which sufficiently appears by the opinion of the Superior Court.

*Isaac Hiester,* for appellant.—The rule which allows extrinsic evidence to explain the extent of a subject sold has no application when a subject-matter exists which satisfies the terms of the conveyance: Hughes v. Westmoreland Coal Co., 104 Pa. 207; Wusthoff v. Dracourt, 3 Watts, 240; Harvey v. Vandegrift, 89 Pa. 346; Thompson v. Kaufman, 9 Pa. Superior Ct. 305; Light v. Miller, 38 Pa. Superior Ct. 408; Blackborn v. Edgley, 1 P. Wms. 600; Messer v. Rhodes, 3 Brewster, 180; Brendlinger v. Brendlinger, 26 Pa. 131.

It is not within the province of the court to place upon a contract a construction at variance with the plainly expressed intention of the parties whether the contract be reasonable or not: Nelson v. Von Bonnhorst, 29 Pa. 352; Phila. v. River Front R. R. Co., 133 Pa. 134.

A liquidating partner is entitled to charge for any proper and reasonable expenses connected with such liquidation but not for anything expended in carrying on the business upon his own account since the dissolution of the firm: Meskill v. Stratton, 7 Phila. 395.

Where the articles are carried into execution without a survey there in general the contract is considered as closed except in extreme cases showing misapprehension of fraud.  The court refused to open the settlement in the following cases: Dagne v. King, 1 Yeates, 322; Smith v. Evans, 6 Binn. 102; Boar v. McCormick, 1 S. & R. 166; McLelland v. Creswell, 13 S. & R. 143; Haggerty v. Fagan, 2 P. & W. 533; Cronister v. Cronister, 1 W. & S. 442; Dickinson v. Voorhees, 7 W. & S. 353; Bailey v. Snyder, 13 S. & R. 160; Coughenour v. Stauft, 77 Pa. 191.

*J. Snyder*, of *Snyder & Zieber*, with him *J. Fred Hartgen*, for appellee.—The acts and declarations of the parties under an agreement are to be taken as a guide to their understanding and intentions in giving a construction to the writing: Lehigh Coal & Nav. Co. v. Harlan, 27 Pa. 429; Pratt v. Campbell, 24 Pa. 184; Marshall v. Berridge, L. R. 19 Chanc. Div. 233; Wald's Pollock on Contracts, *451; Schlegel v. Herbein, 174 Pa. 504; Dist. of Columbia v. Gallaher, 124 U. S. 505 (8 Sup. Ct. Repr. 585).

OPINION BY RICE, P. J., July 20, 1910:

Adopting substantially the language of appellant's abstract, the bill alleged: that the plaintiff and the four individual defendants had been substantially the only stockholders of the Reading Suburban Real Estate Company, each owning about one-fifth of the stock; that the corporation was the owner of sundry tracts of land; that the plaintiff and the four individual defendants also jointly owned other tracts of land, each owning one-fifth; that on May 31, 1901, the corporation and the five individuals

entered into an agreement that all the lands owned by the corporation and by the individuals jointly should be parted (and the other small stockholders settled with) at the joint expense, so that the plaintiff and Hannah Keiser should each own a divided fifth of the company's lots and lands on surrendering their stock for cancellation, leaving the corporation the owner of the other three-fifths; that the plaintiff and Hannah Keiser should have a two-fifths share of the lands held individually, and should each have also one-fifth of the moneys owing and other assets of the corporation on an accounting; that the agreement had been partially carried into effect by the plaintiff and Hannah Keiser surrendering their stock and receiving deeds for one-fifth each of part of the company's land in pursuance of a partial partition, and for a two-fifths share of the lands held individually, but that other tracts remained to be parted and an account remained to be stated; and prayed relief accordingly.

1. Amongst the tracts of which the plaintiff claimed partition there were, as described in the bill, certain strips of ground situated on the east side of Trent avenue between Lafayette avenue and the Bernville road. As to these the defendants answered that on account of proposed street extensions and exchanges with the adjoining property holders on the east it was impracticable to divide them. In the judge's findings they are described as a number of short and narrow strips of land along the east side of Trent avenue, between it and the eastern boundary of the company's land, which, he says, are valuable or useful for no purposes other than those of controlling street lines and extensions and exchanging with other property holders on the east. He finds that "for these purposes they may have a prospective value to the suburban enterprise as a whole" but that present partition is impracticable. In his opinion overruling the plaintiff's exceptions to his findings, he points out that Trent avenue is not an opened but a projected street, and that its eventual opening, as well as that of the continuations eastwardly

of the streets approaching from the west, in harmony with the entire plan of Wyomissing, depends upon the control of these strips, themselves without appreciable value, in the interest of the proposed suburb. We quote his language: "It is not enough that plaintiff recognizes the streets in question. It is necessary that the company be in a position to insure recognition of them by its eastern adjoiners. With a view to the integrity and success of the whole project, the strips are as necessary for the good of the entire settlement as the items (1) to (4), conceded not to be liable to partition. The difficulty of their partition is not, of course, an obstacle. But their retention in their present shape by the company for the purpose indicated and the only possible use that can be made of them are and will be beneficial alike to the plaintiff and to the defendants. Hence neither ought they to be parted nor would it be equitable to compel the defendants to pay the plaintiff for them." It is further to be noticed that no evidence was given by the plaintiff specifically contradicting the averment of the answer as to these strips of land, and that on the trial of the case counsel for plaintiff said with regard to the clause of the bill embracing them, "It being conceded upon the hearing by the defendants that Trent avenue shall be opened as laid out upon the plot of the east addition to Wyomissing already offered in evidence we have no further testimony to submit." In view of the state of the pleadings and the proofs, we conclude that the learned judge was right in refusing to decree partition of these strips of land. The first assignment of error is overruled.

2. Counsel on both sides discuss the second, fourth, fifth and ninth assignments under one head, and we will pursue the same course. They relate to lots designated in items (11) to (15) of the bill, which it is claimed by the defendants belonged to the Yeager farm and were taken by them in the former partition as part of that farm. On May 31, 1901, all the parties to the bill entered into a written agreement in which they recited that they owned

nearly all the stock of the Reading Suburban Real Estate Company, which company owned lands in Spring township, and as individuals owned also a number of tracts, "namely, the Yeager tract and the Yost tract, that is to say, the remainders of the said tracts, part thereof having been sold;" that as individuals they owned also a water plant located on the property; and that they had determined to divide the properties among them as thereinafter fully set forth. It was therefore agreed: 1. That "all the lots and land owned by the Reading Suburban Real Estate Company" should be divided by David H. Keiser, this plaintiff, into five equal parts and that he and Hannah Keiser should each take such one of the one-fifth parts as Merritt, Thalheimer and Mengel should designate, and in default of their designating then Hannah and David H. Keiser might severally choose one of the five purparts. 2. That there should be made two parcels or purparts of certain of the remaining property of the parties, the first of which purparts should embrace "Yost 62 acres," "Yeager 33 acres," "Chestnut 10 acres," and that Hannah Keiser and D. H. Keiser might elect to take either one of the two purparts. 3. That the terms of the agreement should be fully carried out and executed within thirty days of the time of the division of the lots by David H. Keiser, and that the company should promptly furnish to him "such data as he shall ask and require to enable him to make the said division." The bill alleged that the agreement had been so far carried into effect that the shares of stock in the corporation, owned by the other parties, were purchased as provided in the agreement, and that the lands referred to in the agreement were amicably parted and divided substantially as provided therein, with certain exceptions, amongst which alleged exceptions are the lots referred to in the assignments of error immediately under consideration. No facts furnishing a reason for not embracing these lots in the partition made by the plaintiff are alleged in the bill. As already stated, the defendants averred in their answer, that they are all parts of the Yeager tract,

being treated under the agreement as part of purpart No. 1. It is admitted that, in the division that was made by the plaintiff, purpart No. 2 was taken by him and Hannah Keiser, and that purpart No. 1 fell to the other defendants. The question is, whether they took as part of it the lots in question. The words "Yeager 33 acres," used in the agreement, are manifestly inadequate of themselves to define the limits of that tract. They may be read, and doubtless were intended to be read in connection with the preceding words "the Yeager tract and the Yost tract, that is to say, the remainders of the said tracts, part thereof having been sold." The lots in question were part of the Yeager tract that had not been sold and, according to the defendants' testimony, had not been plotted. If there were nothing further to indicate an intention to exclude them there would be scarcely room for doubt that the intention was to include them in purpart No. 1. But it appears that at the date of the agreement the legal title to them was in the company, and therefore, it is argued, it could not have been intended to include them in purpart No. 1, but it must have been intended to include them in the first paragraph of the agreement under the comprehensive description, "all the lots and land owned by the Reading Suburban Real Estate Company." If this view be adopted, it will be necessary to construe the clause relating specifically to the Yeager tract to mean the part only of that tract which the parties owned as individuals. If that was their meaning, it seems remarkable that they used language which in its ordinary sense indicates a plain intention to dispose of the tract as an' entirety. Further, regard must be had to the position of the parties and the nature and condition of the subject contracted about. See opinion of our Brother HEAD in Trexler v. Reynolds, post, p. 168, and the cases there cited. Having this principle in view, doubt is cast on the construction that would exclude these lots from purpart No. 1 by the fact, shown by abundant evidence, that the whole of the unplotted remainder of the Yeager farm,

including these parcels (11) to (15), was leased and farmed as an entire tract.  Moreover, as the parties in their arrangement for partition were dealing with the entire property devoted to the enterprise in which they were concerned, both as individuals and as members of the corporation, it is not improbable, indeed it seems probable, that they overlooked the exact status of the legal title to the different parts of the Yeager farm (as they certainly did the status of the legal title to the Yost farm when they spoke of it as being owned by them as individuals), or deemed it an unimportant matter; the important and prominent thought in their minds being that the unplotted remainder of the Yeager tract which at the time of the agreement the parties treated as an entirety should be treated in the same manner in the partition that was to be made.  If this construction of the agreement, so far as it specifically relates to the property included in purpart No. 1, brings it in conflict with the general provisions relating to the lots and land the legal title to which was in the company, it would seem to be a case for the application of the general principle of construction, that however general may be the words of one clause of a contract, if, from other clauses of the same instrument, it is plainly and irresistibly to be inferred that the words could not have been intended to control in the disposition of a particular subject - of the contract, the operation of such general words will be restrained.  We have further very material aid in arriving at the intention of the parties in the evidence as to the manner in which the agreement was performed.  It contemplated a complete division so far as it could be made at that time.  The division was to be made and was made by the plaintiff, and the court has found, on sufficient evidence, that the necessary data, including the accepted map or plan of Wyomissing, were furnished to him.  No facts are shown which furnish a satisfactory reason for his omission to include these lots in his division of the lots of the company referred to in the first paragraph of the agreement.  He admits that he did

not forget them and that he had the map before him when he made the division. Within a short time after it was made he received deeds for the shares taken by him, and the defendants went into possession of the Yeager tract, including the portions of the tract in controversy, and have retained possession to this time. This bill for a further partition was not filed until nearly four years afterwards. Wherever the terms of an agreement are equivocal or doubtful, wherever the language of a contract is ambiguous, the practical interpretation of it by the parties themselves in carrying it into effect is entitled to great if not controlling influence: Straus & Sons v. Wanamaker, 175 Pa. 213, 231; Topliff v. Topliff, 122 U. S. 121. As shown by other cases cited in appellee's brief, this principle has frequently been applied, and no case has come to our notice in which it was more pertinent than in the consideration of this contention as to what was intended to be embraced in the Yeager tract. It was incumbent on the plaintiff to show satisfactorily that what he did, and the other parties acquiesced in, did not fully carry out the actual intention of all of them, and this he has not done. These assignments are overruled.

3. The third assignment alleges error in refusing to award partition of land embraced in items (5) and (6) of the bill. The learned judge describes this land in his fourth finding as unplotted portions of the Yost farm east of Evans avenue as projected on the plan, containing the house, the barn (partly within the lines of Evans avenue) and orchard thereof, and at the time of the agreement and since leased and used in connection therewith. As already noticed, purpart No. 1, which fell to the defendants, was according to the agreement to embrace "Yost 62 acres," and in the preamble of the agreement the fact was recited that the parties "as individuals" owned a number of tracts of land, "namely, the Yeager tract and the Yost tract, that is to say, the remainders of the said tracts, part thereof having been sold." Substantially the same reasons that have led us to the conclusion that the

unplotted portions of the Yeager farm were intended to be embraced in purpart No. 1 are urged in support of the defendants' contention that these parts of the Yost farm, referred to in the bill and in the judge's fourth finding as items (5) and (6), were also intended to be included in that purpart. And we would not be convinced that different results ought to be reached as to the two tracts were it not for the first clause of the agreement. We have already referred to it, but it seems important to quote it, as well as part of the second clause, in this immediate connection. "First. All the lots and land owned by the Reading Suburban Real Estate Company shall be divided by David H. Keiser into five equal parts, the portion of the Yost farm situate west of Evans avenue, containing about sixty-two (62) acres, shall not be embraced in the said division." Then, after certain matter not necessary to be noticed now, occurs the second clause. "Second. There shall be made two parcels or purparts of certain of the remaining property of the said parties as follows: purpart No. 1 Yost 62 acres," etc. The portion of the Yost farm in controversy lies east of Evans avenue, and the whole farm was conveyed to the company in 1896. Recurring to the language of the agreement, it is seen that in framing the first clause the parties had directly in mind the unsold portion of the Yost farm and the division of it by Evans avenue. Both parts being owned by the company would, unless a different intent were shown otherwise, be included in the general and comprehensive description "all lots and land owned by" the company. So that, it is argued, the words relating to the portion of the farm west of Evans avenue must be regarded as excepting it, but leaving the general clause to apply to the other part. The case may also be stated in this way: considering the two clauses together and noticing the identity in name and number of acres, it is evident that the Yost tract, which was to be embraced in purpart No. 1 under the second clause, was identical with the portion of the Yost farm excepted from the division to be

made under the first clause, and as the latter was specifically limited by the parties as to its eastern boundary by Evans avenue, the same limitation and restriction applied to purpart No. 1 and therefore the land in controversy was not included in that purpart, but was embraced in the property that was to be divided into five purparts. Confining attention strictly to the terms of the agreement, we are unable to avoid the conclusion that the foregoing is the true construction; indeed, it seems to be the plain and irresistible construction and not even open to doubt. This being so, the extrinsic fact that the orchard and some of the farm buildings are east of Evans avenue, while giving rise to speculation as to the reason for not including them in purpart No. 1, does not furnish an adequate reason for departing from the plain terms of the agreement. Observe, it is not "the Yost farm," but a "portion of the Yost farm," that is excepted from the division to be made under the first clause. Much less does the fact that the portion of the Yost farm described does not contain sixty-two acres, but only fifty-seven acres, warrant us in setting aside the monument called for, namely, Evans avenue, in determining its location. "Where the meaning of an agreement is doubtful, its terms are to be considered in the light thrown on them by proved or admitted facts. The situation in which the parties stand, the necessities for which they would naturally provide, the conveniences they would probably seek to secure, and the circumstances and relations of the property in regard to which they have negotiated, are all elements in the interpretation of an ambiguous contract:" Lacy v. Green, 84 Pa. 514; Meigs v. Lewis, 164 Pa. 597. We have been guided by this well-understood principle in construing the agreement as to the Yeager tract, but, as seen from the above statement of it, it is applicable only to ambiguous contracts. It is equally well settled that the rule which allows extrinsic evidence to explain the extent of the subject of an agreement has no application where a subject-matter exists which satisfies the terms of the instrument:

Harvey v. Vandegrift, 89 Pa. 346; Thompson v. Kaufman, 9 Pa. Superior Ct. 305; Light v. Miller, 38 Pa. Superior Ct. 408. The distinction is well shown by Mr. Justice TRUNKEY in Hughes v. Westmoreland Coal Co., 104 Pa. 207, thus: "If a written contract relates to a house or a tract of land, and it be proved by parol evidence that there are two houses, or two tracts, alike within the description, the fact must be determined by the jury. But when the location of the land described in the deed is certain, it needs not a jury to distinguish it from another tract. If it be admitted that the boundaries of a tract of land actually exist on the ground, as named in the deed, a jury shall not interpret the deed, or determine that the land is in another place." Great importance is attached by appellee's counsel to the fact that in making the division under clause one the plaintiff did not include this land. If the terms of the agreement were equivocal or doubtful, or if its language were ambiguous, this would be a highly important fact, because, as already shown in discussing the Yeager tract, it would tend to show the practical construction which the parties themselves placed upon the agreement in carrying it into execution. But as the terms of the agreement are not equivocal or doubtful, the mere fact last alluded to can have no controlling weight in their construction, particularly as it is conceded in the answer that other lots plainly intended by the agreement to be partitioned were not included in the first partition, but are to be in this. But it is asserted in the answer that the reason why the lots referred to in this assignment were not divided under clause one was because "they were a necessary part of the farm and it was agreed that they should be taken as part of the farm." This averment, if it was intended to relate to the written agreement, is not sustained, as we have already seen. It doubtless was intended to relate to some agreement arrived at in the course of the actual partition, and we have carefully examined the evidence to ascertain whether, in that view, it is sustained, and we are constrained to

hold that it is not. The plaintiff's testimony directly negatives it, and the defendants' testimony leaves it wholly to conjecture, as the following excerpts will show. Mr. Mengel, being asked what was done with regard to the Yost tract at the time of the division as indicating what was intended to be covered by it, answered: "Well, you know that was a thing which had to be turned over to Mr. Merritt; we had discussed the matter in the office, but Mr. Merritt had direct negotiations." Mr. Thalheimer testified: "Q. What was said? A. There was not anything said. All those transactions were gone through by Mr. Merritt. We held our meetings in the office and read the letters from Keiser's attorney and it was entirely in charge of Mr. Merritt." The testimony of Mr. Merritt is no more definite. Being asked to state, from anything that was said, why it was that the plaintiff did not include these lots in the division, he answered: "Well, there was nothing said. He didn't do it, and of course we considered he shouldn't do it." Without further elaboration we conclude, first, that the terms of the agreement, so far as they relate to the Yost farm, are plain and unambiguous, and under them the lots in question were not intended to be embraced in purpart No. 1, but were intended to be divided under clause one; second, that there is no sufficient evidence to sustain a finding that during the actual course of partition the parties mutually agreed to a modification of the terms of the written agreement which would result in making these lots part of purpart No. 1; third, that nothing transpired after the execution of the written agreement which precludes the plaintiff from claiming partition of these lots in accordance with its terms. It follows that the third assignment must be sustained.

4. It is alleged in the eleventh assignment that the court erred in refusing to reduce the plaintiff's owelty of $937.50 to $367.50 by allowing for eleven acres excess acreage of the Yeager farm. In order to a correct understanding of the question raised by this assignment it is

important to have in view the entire second clause of the agreement, which we prefer to quote in full rather than attempt to summarize its provisions. "Second. There shall be made two parcels or purparts of certain of the remaining property of the said parties as follows:

PURPART No. 1.

| | | |
|---|---|---|
| Yost, 62 acres, $150, | $ 9,300 | |
| Mortgage $10,000, | 10,000 | $700 |
| | | |
| Yeager, 33 acres, $300, | $9,900 | |
| Chestunt, 10 acres, $10, | 100 | $10,000 |
| | | $9,300 |

PURPART No. 2.

| | | |
|---|---|---|
| Water Plant, | | $6,000 |
| Endy House, | | 2,000 |
| Springmont House, | $1,800 | |
| Mortgage, | 1,200 | 600 |
| | | |
| Hartgen House, | $2,000 | |
| Mortgage, | 1,275 | 725 |
| | | $9,325 |

The said Hannah Keiser and David H. Keiser may elect to take either one of the said purparts named, that is to say, purpart No. 1 for $9,300, subject to the mortgage of $10,000, or purpart No. 2 for the sum of $9,325, and as the said Hannah Keiser and David H. Keiser have but a two-fifths interest as against a three-fifths interest of the remaining three parties, the said Hannah Keiser and David H. Keiser shall be charged with such sum as shall equalize the said parties." Adding the valuations placed in the agreement upon the two purparts, dividing the aggregate by five, and subtracting the quotient from one-half of the valuation of the second purpart, the difference to be paid by the plaintiff is ascertained to be $937.50, and in the

statement of the account adopted by the court the plaintiff was charged with this difference. The court has found that when the defendants came to write up the plaintiff's account in the books they discovered that the Yeager farm was fifty-one acres instead of thirty-three acres. They proposed to the plaintiff that they would charge themselves with the price of fifty-one acres, but at $250 per acre, which would result in reducing the charge for owelty from $937.50 to $367.50. He objected to the charge of the price per acre, but submitted, and the books were written up in that way. Subsequently the defendants found that in the fifty-one acres they had included from seven to eight acres used by the railroad and concluded that they would allow the plaintiff nothing for the eleven acres which they had gained. He contended that as the defendants were getting forty-four acres which, at $300 per acre, would amount to $13,200 instead of thirty-three acres worth $9,900, or an increase of $3,300, the court should at least allow the books to stand whereby they only sustained a surcharge of $2,850. The court sustained the defendants' contention that the owelty as fixed by the agreement should stand. In support of this conclusion the court said: "The understatement as to the Yeager farm was discovered by defendants, who, not taking into account the railroad appropriation, were willing to make an equitable allowance to plaintiff for the whole of the eighteen acres—not at the rate of $300 per acre, because part of the land was not worth it, but by figuring the entire acreage at $250. Without securing from him his consent to a modification of the agreement of May 31, 1901, in this respect, they made the entry upon their books according to their own notions of what was right and fair— the total charge being based upon an estimate again involving a misapprehension concerning the quantity of land they were really getting, because they failed to deduct the area covered by the railway. Surely there is no principle of equity which would bind them to the terms of an entry thus mistakenly made, without previous nego-

tiations and agreement with the plaintiff. It was simply in the nature of an offer to him, which, both according to the civil law, Schuster, Principles, etc., p. 97, and according to ours: Butler v. Kemmerer, 218 Pa. 242; Sav. & Trust Co. v. Chadwick, 223 Pa. 70; Clements v. Bolster, 6 Pa. Superior Ct. 411, could not ripen into a contract until accepted by him, and until then was revocable. The defendants' offer in this case never was accepted by the plaintiff. When the parties came to negotiate about it defendants had discovered their error and in effect withdrew their offer except on condition that the land covered by the railway be deducted from their estimate. This plaintiff refused, and defendants thereupon insisted upon the terms fixed by the written agreement, the only subsisting contract between the parties. It is difficult to see why they had not the right to do so, or wherein a recognition of their right to do so works inequity to plaintiff. The case is not one in which a party buys from another the whole of a tract at so much per acre, figuring the total upon the basis of the entire acreage of what was known to belong to it, and it is subsequently found that the tract includes other land not known to belong to it. It is a case where one buys a tract known to cover such and such territory at a lumped sum assumed to be equal to so and so much an acre, and it is found that the land known to be embraced in it foots up a greater number of acres than supposed. If the defendants were justly held to payment of the whole figure put upon the Yost tract although they got less land than all the parties understood they were getting—and there is no question made of that—it would seem but fair to hold them entitled to the whole of the Yeager tract at the price agreed upon although they got more acres by it than originally estimated. To require anything else of them would be not to enforce the contract the parties made, but to make a new contract for them." It is further to be noticed in the same connection that the testimony shows that the field of eighteen acres was worth only about one-third of the value of the

land facing the railroad, and if this excess be valued at $100 and the seven or eight acres of land occupied by the railroad company be deducted, no substantial injustice was done to the plaintiff. It is still further to be noticed that if a change should be made in the acreage of the Yeager tract, a similar correction should be made in the acreage of the Yost tract, where the appellees, in any view of the case, got considerably less than it was estimated to contain in the agreement. The appellees' counsel correctly argue that if a court of equity is to make a readjustment of this matter it ought to include 'a readjustment of the price with which they were charged for the Yost tract. After a careful consideration of the question in all of its aspects, it is not clear that the result would be changed favorably to the plaintiff, and for that reason as well as those set forth in his opinion we are of opinion that the conclusion reached by the court should not be disturbed. The eleventh assignment is overruled.

5. The sixth assignment relates to the action of the court in not striking from the credits claimed in the account submitted by the defendants all of the payments made on account of office rent, secretary's salary, contingent fund, telephone rentals, re-lettering sign, typewriter supplies and repairs, city directories, and lamp, making in the aggregate $4,154.30, and in allowing one-half of these credits, $2,077.15, to stand. The clauses of the agreement necessary to be noticed in the consideration of this assignment, as well as the seventh, eighth, tenth and thirteenth assignments, are, "the said corporation shall from time to time account for and pay to the said Hannah Keiser and David H. Keiser two-fifths of the net proceeds of moneys collected as hereinafter more specifically set forth," and the said parties shall be entitled to receive "each of them one-fifth of all moneys collected on account of lots or land already sold, but from the said moneys there shall be deducted before a division of them, the cost of collection," etc. The learned judge correctly found that the expenses referred to in this assignment

were properly incurred in keeping up an office and the needful instrumentalities for attending to the business thus devolved on the company, but because of the fact that the defendants were at the same time and by the same means serving their own purposes he cut down the claim one-half. Regarding the plaintiff's contention that no part of it ought to have been allowed beyond ten per cent of the aggregate collected, which, according to some testimony, is the usual allowance for the collection of money, he said: "It is insisted that the agreement for the deduction of the cost of collection before division must be taken to mean the usual cost in such cases. But the agreement does not say so, and the 'cost' of a thing does not primarily or ordinarily mean that. It means the actual expenditure involved: see Webster, ad verb.; Standard Dic., ad verb., the word 'actual' in reality adding nothing to what, without it, is implied in the term 'cost': see State v. Price, 12 Wash. 653 (42 Pac. Repr. 120); State v. Hamilton (Miss.), 10 So. Repr. 57. Especially would this seem to be so in an agreement whose purpose was an amicable division of assets between parties regarding themselves as co-owners, part of which assets were outstanding and had still to be got in, while certain other operations were to be continued for the benefit of all the parties in interest." We concur in this conclusion. A more difficult question is raised by the defendants' contention that the testimony is insufficient to enable the court to determine the proportion between the business in which the plaintiff was interested and that in which the defendants alone were interested. The learned judge appreciated the difficulty, but says that while the testimony does not show the precise proportion, "it does show that both ought to contribute to the expense of the office, etc., maintained for the benefit of both; it shows that the collections upon past transactions amounted to a substantial sum; and it shows what remained to the defendants as the basis of the business conducted for their exclusive benefit. The allowance objected to is founded upon these considerations—not by

way of bare conjecture, which is not legitimate, but by way of approximation which may be. As was said by Mr. Justice DEAN in Yoders v. Amwell Twp., 172 Pa. 447, 'Approximate certainty in the administration of justice, on evidence in an issue, is all we can hope to attain to.' " This is certainly true in the determination of such a question as is presented here. It could not be expected that the proportion could be determined with scientific precision. But having as a basis the facts alluded to by the learned judge the proportion could be determined with approximate certainty; it was largely a question of fact, and we are not convinced that the finding was so unsupported by competent testimony as to be a mere guess. After deliberate consideration of the objections urged against the finding, we conclude that it ought not to be disturbed. The sixth assignment is overruled.

6. The seventh assignment alleges error in charging the plaintiff with a share of the state tax on the capital stock of the company after the plaintiff had retired and his shares were canceled. This charge was sustained as part of the cost of collection. But it is apparent from the opinion of the learned judge that he would not have sustained it had it not been for the fact that when a dissolution of the corporation was attempted the plaintiff objected and the proceedings were not carried to a successful completion. The evidence as to this subject is exceedingly meager and consists of the testimony of Mr. Hartgen that in January, 1903, "the company filed a petition for dissolution, and then later on Mr. Keiser filed a remonstrance, and it has been held up since then." If his objection or remonstrance was sufficient in law, having regard to the agreement, to prevent dissolution of the corporation, we fail to see how his action furnishes a reason for estopping him from objecting to this charge, when, as correctly conceded by the learned judge, the charge for taxes paid on the capital stock prior to that time was not a proper one. It is to be borne in mind that the agreement plainly provided that the corporation should from

time to time account, and this implied that it should be
kept alive for that purpose. Necessarily, if it was kept
alive, the state tax on the shares of capital stock would be
a burden which would have to be borne by the company,
and it is to be presumed that this was understood by all
the parties. The plaintiff has been charged with his share
of all the taxes on the property remaining undivided and
it is far from clear that he should be charged also with the
tax on the capital stock after he had surrendered his
shares. As the counsel for appellant well says, the state
tax is a tax on property: Commonwealth v. Delaware,
etc., R. R. Co., 165 Pa. 44, and the property on which this
tax was levied was the property of the defendants, in
which the plaintiff has no interest. The argument
whereby he is made to contribute to the reimbursement
of the corporation for the taxes thus paid is not convinc-
ing. It requires too severe a strain of the terms of the
agreement to hold that this is a proper charge under the
head of cost of collection. This assignment is sustained,
as is also the thirteenth assignment, so far as it relates to
the credits allowed upon exceptions to the decree for pay-
ment of state taxes on capital stock. So far as the thir-
teenth assignment relates to the other credits claimed and
allowed, it is overruled. As is well said by the learned
judge, to refuse their allowance would be to refuse that
which had been decided to be proper for allowance and for
the bringing in of which there had been no previous op-
portunity. "The procedure in equity is sufficiently elastic
to provide an escape from such a result."

7. The eighth assignment alleges error in not striking
from the credits attorney fees paid by the company, not
in this litigation, amounting to $375. The learned judge
found as a fact that these payments were made for the
benefit of all the parties, and in accord with the practice
antedating the agreement of May 31, 1901, and in his
opinion overruling the exceptions he well sustained his
conclusion, that these expenditures ought to be borne
equally by all in proportion to their interests, by these

pertinent remarks, which we adopt as a sufficient answer
to this assignment: "The circumstance that the agreement
provides that 'all expenses, costs and damages incurred
by or accruing from any litigation concerning past mat-
ters . . . . shall be borne equally by the . . . . five in-
dividual parties' cannot be looked upon as decisive against
an allowance, as part of the common expenses, of the
accustomed annual retainer paid to counsel for services
beneficial alike to all the parties interested. Considering
the scope and purposes of the arrangement made by them
and their common and continuing interests to be served
by it, it on the contrary appears to be a reasonable con-
clusion that they intended, at least as long as the corporate
organization was kept up, the employment of the machin-
ery and outside agencies employed at the time and the
inclusion of the expense thereof as part of the cost to be
shared by all." The eighth assignment is overruled.

8. The tenth assignment alleges error in allowing the
defendants to take the office furniture and fixtures at the
estimated value set forth in their account of $150. The
agreement provides, inter alia, that the company shall set
over to Hannah Keiser and David H. Keiser "the undi-
vided two-fifths of all other property or assets not other-
wise hereinafter disposed of in this agreement." These
were assets of which or the value of which the plaintiff was
entitled to one-fifth. It is undisputed that by an appraise-
ment agreed to at the time of the execution of the agree-
ment they were valued at $480. The defendants in addi-
tion to the $150, their estimated value at the time of the
statement of the account, charged themselves with $23.97
received for certain of them which they had sold. Prima
facie, they should have charged themselves with the ap-
praised value less the amount with which they had charged
themselves for the goods sold, or $456.03: Reiff's App., 2
Pa. 256. But it is contended that as the goods had been
used in the business they had been used for the benefit of
the plaintiff as well as of the defendants and therefore the
depreciation in such use should be borne proportionately

by the parties interested. The learned court took this view, and we are not prepared to say that it is erroneous. It would seem to be supported by the considerations alluded to in the discussion of the sixth assignment. The difficulty in the case is that there is no evidence to sustain the defendants' contention that their value had decreased to $150 between the date of the appraisement and the date of stating the account. If they had depreciated to that extent, the fact was susceptible of satisfactory proof, and we think that the court was in error in assuming the burden of deciding the extent of the depreciation in dollars and cents, without other proof than the mere fact that the goods had been in use for that length of time. We are constrained, therefore, to sustain this assignment and to hold that the decree should be corrected accordingly.

9. The twelfth assignment of error relating to the charge of $200 against the plaintiff on account of the Thalheimer lot is not sustained. If the defendants' testimony as to this matter is to be believed, the charge was a proper one. There was a conflict of evidence which it was for the trial judge to decide, and his decision will not be set aside except for manifest error, and that does not appear. As to the legal proposition that if the plaintiff paid for something he bought for himself with something that belonged to the defendants he ought when he comes into equity for an accounting to stand ready to reimburse them to the extent that the fixed price of the lot exceeds his proportionate interest in it, we think there can be no serious controversy.

The decree is modified and amended in the following particulars, and in all other particulars is affirmed.

1. The first paragraph of the decree is modified and amended by inserting therein immediately before the words "in manner following," the words, "(e) All that certain tract or piece of ground bounded on the north by a fifteen foot alley, on the south by Park avenue, on the east by Orchard lane, and on the west by Evans avenue;

(f) All that certain irregular piece of ground, with the buildings thereon erected, bounded on the north by Park avenue, on the east by property described in item (1) of the bill, on the south by Wyomissing creek and property of Hannah Evans, and on the west by Evans avenue; these being the lands described in items (5) and (6) of the bill."

2. The second paragraph of the decree is modified and amended, and the amount for distribution is corrected accordingly, (a) by striking out the credits allowed for state taxes paid upon capital stock, (b) by charging the defendants with the portion of the amount of the valuation of the office furniture and fixtures with which they are not charged in the decree.

The record is remitted to the court below, with direction to carry this decree as modified and amended into effect.

And it is further ordered, adjudged and decreed that two-fifths of the costs of this appeal be paid by the appellant and three-fifths by the appellees.